UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 10-62000-CIV-ZLOCH/ROSENBAUM

FEDERAL TRADE COMMISSION,

        Plaintiff,

v.

TIMESHARE MEGA MEDIA AND
MARKETING GROUP, INC., a
Florida corporation, also d/b/a
Timeshare Market Pro, Inc., *et al.*,

        Defendants.
_____/

**ORDER**

This matter comes before the Court upon Non-parties Federal Bureau of Investigation and FBI Special Agent David M. Roberts's Motion to Quash Subpoena and for Protective Order [D.E. 98], upon referral by the Honorable William J. Zloch. *See* D.E. 101. The Court has reviewed the Non-parties' Motion, all filings in support thereof and in opposition thereto, and the record in this matter and is otherwise duly advised in the premises. After careful consideration, the Court now grants the Non-parties' Motion for the reasons set forth below.

***I.  Background***

In this Federal Trade Commission ("FTC") enforcement action, Plaintiff FTC seeks to enjoin alleged violations of the Federal Trade Commission Act, 15 U.S.C. § 41, *et seq.*, and the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6101, *et seq.*; to disgorge allegedly ill-gotten gains resulting from the asserted violations, and obtain other equitable

relief for Defendants' alleged transgressions of the statutes. *See* D.E. 1 at ¶ 1. Defendants Pasquale and Lisa Pappalardo (collectively, "the Pappalardos") serve as managers of Defendant Timeshare Mega Media and Marketing Group, Inc. ("TMMMG"), a Florida corporation.[1] The Complaint claims that along with Co-defendants, the Pappalardos engaged in a scheme to deceptively advertise and sell timeshare resale services through interstate telephone calls to consumers throughout the United States. *Id.* at ¶ 17.

According to the Complaint, Defendants made unsolicited calls to consumers who own timeshare units that have been listed for sale with timeshare resale companies, representing that they had a buyer for the consumer's timeshare unit, usually at or above the asking price. *See id.* at ¶¶ 18-19. When consumers indicated their interest in the offer, the Complaint continues, Defendants explained that the consumers had to pay a fee for the sale to proceed, but that the fee would be refunded in full at the closing of the sale of the timeshare unit. *Id.* at ¶ 20. While the Complaint asserts that the fee charged varied, it represents that "the most typical fee" was $1,996, with a special "hardship program" fee of approximately $999 for those who stated that they could not afford to pay the larger fee. *Id.* at ¶ 21. The FTC further avers that Defendants collected the fee by credit card, which they charged the same day. *Id.* at ¶ 23.

Following these telephone conversations, the Complaint alleges, Defendants sent consumers e-mails containing a link to a website where consumers could view Defendants' welcome letter and form contract. *Id.* at ¶ 24. The FTC characterizes the welcome letter as instructing the consumers

---

[1]This action involves several other Defendants as well, but they have not sought the deposition at issue in the Motion under consideration, and they have not objected to the FBI's Motion. Consequently, this Order does not discuss the allegations against these other Defendants.

to sign and return the contract to Defendants, but the contract did not relate to a pending sale of the consumer's unit. *Id.* Instead, the contract provided only that Defendants would advertise the unit for sale. *Id.* While some consumers were allegedly duped and returned the signed contract, the Complaint explains, others called to question Defendants about the contract. *Id.* at ¶¶ 25-26. The Complaint further asserts that in response to such inquiries, Defendants told the consumers that the contract was needed "to get the ball rolling" and that sales documents would be forthcoming. *Id.* at ¶ 26. Based on the FTC's allegations, many consumers then signed and returned the contract to Defendants. *Id.* After Defendants received the signed contract, the Complaint contends, Defendants did not contact those consumers again and engaged in tactics to stall consumers who called Defendants. *Id.* at ¶ 27. Because the sales never closed, the Complaint alleges, consumers attempted to initiate chargebacks challenging Defendants' credit card charges. *Id.* at ¶ 28. But, according to the Complaint, these chargebacks were often denied because Defendants produced the consumers' signed contracts as proof of the consumers' agreement to pay for Defendants' purported marketing services. *Id.*

Along with its Complaint in this case, the FTC also filed an *Ex Parte* Motion for Temporary Restraining Order and Motion for Order to Show Cause Why a Preliminary Injunction Should Not Be Granted [D.E. 9]. In support of its *Ex Parte* Motion, the FTC filed, among other evidence, the Declaration of Federal Bureau of Investigation ("FBI") Special Agent David M. Roberts. *See* D.E. 11-1; *see also, e.g.,* D.E. 8 at 8 n.32, 10 n.38, n.39, n.43, 11 n.46, n.47, n.49. The Court granted the FTC's Motion for Temporary Restraining Order and Motion for Order to Show Cause. *See* D.E. 13. Thereafter, instead of proceeding with a hearing on the FTC's Motion for Preliminary Injunction, the Pappalardos stipulated to a preliminary injunction. *See* D.E. 52.

On September 23, 2011, the parties attended Court-ordered mediation. *See* D.E. 91. The mediator issued her Report of Mediation, indicating that the parties had "reached a full settlement in principle and [would] jointly move . . . for an extension of 90 (ninety) days for all pending deadlines in the scheduling order." *Id.* In accordance with the Report of Mediation, the FTC and the Pappalardos filed their Joint Motion to Extend Pending Deadlines [D.E. 92]. In this document, the parties represented that the mediation had been "successful" and that "[a]ll settlement terms, including stipulated final judgments and permanent injunctions, [had] been agreed upon in principle, and the Parties [were] in the process of reducing these proposed settlements to writing."

Despite this development, the settlement later fell apart. *See* D.E. 103. Then the Pappalardos served Special Agent Roberts with a deposition subpoena. *See* D.E. 98-1. Counsel for the FBI and Agent Roberts objected, complaining that the Pappalardos had failed to comply with the FBI's *Touhy* regulations and the Privacy Act. In response, counsel for the Pappalardos purported to comply with the FBI's *Touhy* regulations and submitted a statement indicating that the Pappalardos sought Agent Roberts's[2] testimony

> as it relates to his participation in, and knowledge of, an investigation of Timeshare Mega Media and Marketing Group, Incorporated. The parameters of Agent Roberts' anticipated testimony includes his knowledge of any participation by Pasquale and/or Lisa Pappalardo, Timothy Burns, Jack Bauman, Luis Duany, Mike Spinelli, Scott Schneider, Paul Brucato, and Charles Schwab in the matter and their respective roles. Agent Roberts will also be questioned on the Declaration he executed on September 24, 2010[,] in support of the action filed in case no. 10-62000-Civ-Zloch.

D.E. 98-2 at 7.

Following additional exchanges of letters, the FBI and Agent Roberts (collectively, "Non-

---

[2] *See* William Strunk, Jr., & E.B. White, *The Elements of Style* 13 (4th ed. 1999).

parties") filed the pending Motion, seeking to quash the deposition subpoena. In support of their Motion, the Non-parties note that several others allegedly involved with the Pappalardos have been criminally charged, and the investigation into the Pappalardos and others remains ongoing. They further contend that (1) the Pappalardos have failed to comply with the FBI's *Touhy* regulations; (2) the Pappalardos' proposed deposition topics impinge on the FBI's law enforcement and investigatory files privilege; (3) the Pappalardos' requested deposition interferes with the FBI's criminal investigation of the Pappalardos and others; (4) the Pappalardos seek grand-jury information; and (5) the Pappalardos have not followed the requirements of the Privacy Act. *See* D.E. 98. In response, the Pappalardos protest that the FBI and Agent Roberts have waived any process or privilege that may otherwise have prevented or limited the deposition of Agent Roberts by filing and relying upon Agent Roberts's declaration in support of the FTC's *Ex Parte* Motion for Temporary Restraining Order. *See* D.E. 99. The Non-parties disagree, asserting that they have not waived process or privilege, and, even if they have, any waiver is limited to the scope of Agent Roberts's deposition. *See* D.E. 104. This matter is now ripe for decision.

## II.  Discussion

### A.  The FBI's Touhy Regulations

So-called *Touhy* regulations derive their name from *United States ex re. Touhy v. Ragen*, 340 U.S. 462 (1951), the Supreme Court case that first recognized their validity. *See Gulf Grp. Gen. Enters. Co. v. United States*, 98 Fed. Cl. 639, 644 (Fed. Cl. 2011). They concern testimony by agency employees and are promulgated by executive agencies under 5 U.S.C. § 301, sometimes referred to as the federal "housekeeping statute." *Westchester Gen. Hosp., Inc. v. Dep't of Health and Human Servs.*, 2011 WL 4862986, *4 n.1 (11th Cir. Oct. 14, 2011). Where *Touhy* regulations

apply, a litigant must comply with them to obtain the testimony of an agency employee.  Among other purposes, *Touhy* regulations allow an agency to conserve its resources to effect the mission of the agency, rather than suffering the cumulative drain on resources that providing witnesses for private litigation can impose.  *See Moore v. Armour Pharm. Co.*, 927 F.2d 1194, 1197-98 (11th Cir. 1991).

But important limitations on *Touhy* regulations exist.  First, "[w]ith near unanimity," courts have concluded that *Touhy* regulations do not apply when the United States is a party to the litigation.  *Resource Invs., Inc.*, 93 Fed. Cl. at 380 (citing *Young v. United States*, 181 F.R.D. 344, 347-48 (W.D. Tex. 1997); (*Dean v. Veterans Admin. Reg'l Office*, 151 F.R.D. 83, 86-87 (N.D. Ohio 1993); *In re Air Crash Disaster at Detroit Metro. Airport on Aug. 16, 1987*, 737 F. Supp. 399, 404-05 (E.D. Mich. 1989); *United States ex rel. Roby v. Boeing Co.*, 189 F.R.D. 512, 514 (S.D. Ohio 1999); *Romero v. United States*, 153 F.R.D. 649, 651 (D. Colo. 1994); *Alexander v. FBI*, 186 F.R.D. 66, 69-71 (D.D.C. 1998); *McElya v. Sterling Med., Inc.*, 129 F.R.D. 510, 514-15 (W.D. Tenn. 1990)).  Here, of course, the United States is a party to the litigation.[3]

Second and even more significantly, following the issuance of *Touhy*, Congress amended Section 301 to state expressly that the statute "does not authorize withholding information from the public or limiting the availability of records to the public."  5 U.S.C. § 301; *see also* 1958 U.S.C.C.A.N. at 3353.  Thus, *Touhy* regulations create no privilege.  *See Resource Invs., Inc. v. United States*, 93 Fed. Cl. 373, 380-81 (Fed. Cl. 2010); *Commonwealth of Puerto Rico v. United*

---

[3]This Court need not consider whether any circumstances may exist where the general rule not requiring compliance with *Touhy* regulations when the United States is a party to the litigation does not apply because in this case, the FBI and Agent Roberts affirmatively acted to inject themselves into the pending litigation when the FTC filed Agent Roberts's Declaration in support of the FTC's *Ex Parte* Motion for Temporary Restraining Order.

*States*, 490 F.3d 50, 62 (1st Cir. 2007) ("*Puerto Rico*"). So, if a basis for denying the deposition of Agent Roberts exists, the FBI and Agent Roberts must find it elsewhere.

B.  *The Law Enforcement/Investigatory Files Privilege*

The federal common-law law-enforcement privilege traces its origins to *Roviaro v. United States*, 353 U.S. 53 (1957). *Puerto Rico*, 490 F.3d at 62. In *Roviaro*, the Supreme Court first recognized a qualified privilege allowing the government to withhold the identities of confidential informants. *Id.* (citing *Roviaro*, 353 U.S. at 59). Since *Roviaro*, numerous courts have concluded that the law-enforcement privilege protects more than just the identities of confidential informants. *See, e.g., In re Eisenberg*, 654 F.2d 1107, 1111 n.5 (5th Cir. Unit B 1981)[4] ("*Eisenberg*"); *In re the City of New York*, 607 F.3d 923, 948 (2d Cir. 2010) ("*New York*"); *In re Dep't of Homeland Sec.*, 459 F.3d 565 569-70 (5th Cir. 2006); *Puerto Rico*, 490 F.3d at 62-63; *Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.2d 1122, 1124-25 (7th Cir. 1997); *United States v. Winner*, 641 F.2d 825, 831 (10th Cir. 1981); *In re Sealed Case*, 856 F.2d 268, 271-73 (D.C. Cir. 1988). Indeed, the qualified privilege has been found to extend to ongoing criminal investigations, *see, e.g., Eisenberg*, 654 F.2d at 1111 n.5, as well as to

> (1) information pertaining to "law enforcement techniques and procedures," . . . (2) information that would undermine "the confidentiality of sources," . . . (3) information that would endanger "witness and law enforcement personnel," . . . (4) information that would undermine "the privacy of individuals involved in an investigation," . . . or (5) information that would seriously impair "the ability of a law enforcement agency to conduct future investigations[.]"

*New York*, 607 F.3d at 948 (citations omitted). As the *New York* Court's ruling regarding the scope

---

[4] Decisions rendered by Unit B of the former Fifth Circuit constitute binding precedent in the Eleventh Circuit. *Stein v. Reynolds Secs., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

of the law-enforcement privilege suggests, "The purpose of this privilege is to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *In re Dep't of Investigation of the City of New York*, 856 F.2d 481, 483-84 (2d Cir. 1988).

**1. Is Agent Roberts's Testimony Protected by the Law-enforcement Privilege?**

The proponent of the law-enforcement privilege bears the ultimate burden of demonstrating its applicability. *New York*, 607 F.3d at 945 n.23 (citing *Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1341 (D.C. Cir. 1984)). Here, on behalf of the FBI, FBI Assistant Special Agent in Charge ("ASAC") Timothy P. Donovan, who oversees and supervises criminal programs at the FBI Miami Division, including the work of Special Agent Roberts, asserts that the law-enforcement privilege protects Agent Roberts from deposition because disclosure of the information that the Pappalardos seek

> would interfere with ongoing law enforcement investigations and proceedings, require [Agent Roberts] to reveal investigatory records compiled for law enforcement purposes, [and] disclose investigative techniques and procedures the effectiveness of which would thereby be impaired. In addition, the Subpoena appears to be improperly used to compel Special Agent Roberts to reveal confidential sources or informants . . . .
>
> Fifteen individuals have now been charged with criminal violations with respect to their activities associated with Timeshare Mega Media and Marketing Group. [The Pappalardos] and other individuals (including those identified in . . . counsel for the Pappalardo Defendants November 3, 2011 letter), have been and remain under criminal investigation with respect to their respective roles in that entity.
>
> . . . [T]he "parameters" proposed [by the Pappalardos for Special

>Agent Roberts's deposition] extend to the very essence of the FBI's investigation and could impede such investigation. The information protected includes the status of the investigation, investigative steps to pursue in the conduct of the investigation, informal deliberations and opinions and conclusions about the evidence gathered during the course of the investigation. . . . [T]his investigation is ongoing and disclosure will interfere in the investigations.

D.E. 98-4 at ¶¶ 6-8. Thus, ASAC Donovan attests that the subjects of the proposed deposition are protected because they regard (1) an ongoing criminal investigation, (2) confidential sources, and (3) law-enforcement techniques and procedures. The Pappalardos do not contest ASAC Donovan's characterization of the information that they seek. Because such information is subject to the law-enforcement privilege, the FBI has satisfied its initial burden to demonstrate the applicability of the privilege.

Once the law-enforcement privilege applies, at least three courts have concluded that "there ought to be a pretty strong presumption against lifting the privilege." *See Dellwood Farms*, 128 F.3d at 1125 (citing *Black v. Sheraton Corp.*, 564 F.2d 531, 545-47 (D.C. Cir. 1997)); *New York*, 607 F.3d at 945. Rebutting the presumption requires the party seeking disclosure to demonstrate (1) that it seeks the discovery in good faith;[5] (2) that "'the information sought is [not] available through other discovery or from other sources," and (3) that the information sought is 'importan[t]' to the party's case," *New York*, 607 F.3d at 945 (citing *Friedman*, 738 F.2d at 1343), a term described by the Second Circuit as requiring a showing of "*compelling* need." *Id.* (citing *Marriott Int'l Resorts, L.P., v. United States*, 437 F.3d 1302, 1307 (Fed. Cir. 2006)) (emphasis added by *New York* Court).

---

[5] The factor has been described by other courts as requiring the party to show that "its suit is 'non-frivolous and brought in good faith.'" *See New York*, 607 F.3d at 945. Because the FTC filed the instant matter, however, the Court construes this requirement as a general one of good faith.

Here, it is not clear that the Pappalardos seek the deposition of Agent Roberts entirely in good faith. Critical to this evaluation is the context in which Agent Roberts's testimony was subpoenaed. The FTC filed Agent Roberts's Declaration in this matter on October 19, 2010. *See* D.E. 11-1. On January 19, 2011, this Court set this matter for the trial period beginning December 9, 2011, with a discovery deadline of November 19, 2011. *See* D.E. 70. The parties reached a settlement in principle on September 23, 2011, with the parties agreeing to "[a]ll settlement terms, including stipulated final judgments and permanent injunctions . . . ," subject only to the FTC Commissioners' approval of the settlement. D.E. 92 at 1. Accordingly, the parties jointly moved for a ninety-day extension of all pending deadlines in the Court's Scheduling Order, which the Court granted to allow for the settlement to be finalized. *See id.*; *see also* D.E. 95. During the ninety-day finalization period, however, on October 18, 2011, the Pappalardos, who were the subjects of an ongoing criminal investigation, subpoenaed Agent Roberts for deposition. *See* D.E. 94. Eventually, the settlement fell apart.

While the Pappalardos may conduct discovery at any time within the discovery period, the timing of the subpoena to Agent Roberts does raise questions concerning the Pappalardos' purposes in deposing Agent Roberts. For the first year that the case was pending — during which time the Pappalardos settled "in principle" the matter, the Pappalardos did not seek Agent Roberts's deposition, even though he had filed his Declaration on October 19, 2010. Instead, they subpoenaed Agent Roberts for deposition after the case was already settled in principle, when, assuming that the FTC Commissioners agreed to the settlement, Agent Roberts's testimony could not possibly bear on the issues in this case. Significantly, however, some of the Pappalardos' alleged cohorts had been indicted, and, as the Pappalardos knew, the criminal investigation of the Pappalardos and others was

still ongoing. Thus, although the Pappalardos insist that they mentioned during the settlement discussions that they intended to proceed with Agent Roberts's deposition in case the FTC did not approve the proposed settlement, *see* D.E. 99 at ¶ 5.B, the sequence of events set forth above nonetheless creates the appearance that the Pappalardos subpoenaed Agent Roberts not for what his testimony could reveal about the civil case but rather for purposes of conducting discovery into the criminal case. As the Eleventh Circuit's predecessor court has explained, if that purpose motivated the Pappalardos' seeking of Agent Roberts's testimony, it presents a problem:

> A litigant should not be allowed to make use of the liberal discovery procedures applicable to a civil suit as a dodge to avoid the restrictions on criminal discovery and thereby obtain [information] he would not otherwise be entitled to for use in his criminal suit. Judicial discretion and procedural flexibility should be utilized to harmonize the conflicting rules and to prevent the rules and policies applicable to one suit from doing violence to those pertaining to the other.

*Campbell v. Eastland*, 307 F.2d 478, 487 (5th Cir. 1962);[6] *see also Eisenberg*, 654 F.2d at 1111 (citing *Campbell*, 307 F.2d at 1113). Under the circumstances present here, therefore, the Court finds that the good-faith factor is, at best, neutral.

With respect to other sources of information, a review of Agent Roberts's fifteen-paragraph, nine-page Declaration reveals that he based his assertions in that document primarily on information provided by cooperating witnesses, cooperating defendants in related criminal cases, records to which the Pappalardos have access, publicly available records, and victim statements. *See, e.g.*, D.E. 11-1 at ¶¶ 5-8 (discussing Schwab's statements to Agent Roberts); ¶¶ 9-10 (describing TMMMG's website and corporate documents); ¶ 11 (relating statements from former TMMMG employees); ¶

---

[6] Pursuant to *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), opinions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent in the Eleventh Circuit.

12 (setting forth the criminal histories of Pasquale Pappalardo and four of his alleged cohorts); ¶¶ 14-15 (cataloguing documents seized from the TMMMG business premises). In addition, the Declaration appends to it several documents seized from the TMMMG business premises. Likewise, the record in this case includes the declarations of cooperating witnesses Charles Schwab (D.E. 11-2 at 2) and Gail Hellman (D.E. 11-2 at 23); criminal defendant Scott Faraguna (D.E. 11-2 at 15); and alleged victims Robert C. Burk (D.E. 11-3 at 2), Amy Elliott (D.E. 11-4 at 2), Carmen Federico (D.E. 11-4 at 19), Farris Gumma (D.E. 11-4 at 44), Doug Harmon (D.E. 11-5 at 2), Alfred Lien (D.E. 11-5 at 25), Santa Magnell (D.E. 11-5 at 41), Darrell Patrick (D.E. 11-5 at 61), Donna Sandry (D.E. 11-6 at 2) Nancy Seeger (D.E. 11-6 at 18), William Swierupski (D.E. 11-6 at 43), Henry Watson (D.E. 11-6 at 53), Laura Wroble (D.E. 11-6 at 64), and Ernest Yamamoto (D.E. 11-6 at 83). Thus, it appears that the Pappalardos could depose any or all of these individuals to obtain directly the same information that Agent Roberts possesses as a result of having conducted his investigation. Consequently, this factor does not favor the Pappalardos.

Finally, the Court considers the Pappalardos' need for the testimony of Agent Roberts. Significantly, a review of the Pappalardos' Response to the FBI and Agent Roberts's Motion to Quash reveals that the Pappalardos never explain their need to depose Agent Roberts. The Court, however, will construe the Pappalardos' assertion that the FTC disclosed Agent Roberts as a witness and filed his Declaration in support of the *Ex Parte* Motion for Temporary Restraining Order as its expression of need for Agent Roberts's deposition. *See* D.E. 99 at ¶ 8. For its part, the FTC denies that it ever listed Agent Roberts as a "trial witness," and it has further indicated that it will not call Agent Roberts as a trial witness. *See* D.E. 104 at 3 n.2. In and of itself, the mere fact that the FTC relied upon Agent Roberts's Declaration in seeking its *Ex Parte* Motion for Temporary Restraining

Order does not render his deposition testimony "important" to the Pappalardos' case, much less demonstrate a "compelling" need. Agent Roberts's Declaration was only one of numerous declarations and exhibits that the FTC filed in support of its *Ex Parte* Motion for Temporary Restraining Order, and the fact that the FTC does not intend to rely upon Agent Roberts's testimony to prove its case at trial further undermines any argument that his deposition is "compelling[ly]" important to this case. Thus, consideration of all of the presumption-rebuttal factors dictates the conclusion that the Pappalardos have failed to rebut the strong presumption in favor of the law-enforcement privilege.

Even if the Pappalardos had rebutted the presumption, however, in this case, the privilege would remain intact. After a party rebuts the presumption, "a court must still balance '[t]he public interest in nondisclosure . . . against the need of a particular litigant for access to the privileged information.'" *New York*, 607 F.3d at 945 (quoting *In re Sealed Case*, 856 F.2d at 272). In performing this calculus, the "need" that the court considers in the balancing equation is the same "compelling need" set forth in the presumption-rebuttal analysis. *Id.*

Here, as described previously, the "need" that the Pappalardos invoke is not "compelling," but even assuming, *arguendo*, that it is, it does not outweigh the public interest in nondisclosure.[7]

---

[7] Other courts have begun their analysis with the balancing test. *See, e.g., In re United States Dep't of Homeland Sec.*, 449 F.3d 565 (5th Cir. 2006). In so doing, some of these courts have applied what is referred to as the *Frankenhauser* test, named for *Frankenhauser v. Rizzo*, 59 F.R.D. 339, 344 (E.D. Pa. 1973), the opinion that first set forth ten factors for consideration in determining whether the law-enforcement privilege applies. These factors include the following: "(1) the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information; (2) the impact upon persons who have given information of having their identities disclosed; (3) the degree to which governmental self-evaluation and consequent program improvement will be chilled by disclosure; (4) whether the information sought is factual data or evaluative summary; (5) whether the party seeking discovery is an actual or potential defendant in any criminal proceeding either pending or

In arriving at this conclusion, the Court weighs the mere fact that the FTC filed Agent Roberts's Declaration as one of many in support of its *Ex Parte* Motion for Temporary Restraining Order against the harms to the public interest that ASAC Donovan attests will arise out of disclosure of the information that the Pappalardos seek: (1) the impeding of an ongoing criminal investigation and court proceedings involving more than fifteen targets; (2) the possible exposure of confidential informants, thereby ending those informants' ability to participate in this and possibly other investigations; and (3) the revealing of law-enforcement techniques and procedures, which could impair or preclude their future effectiveness. D.E. 98-4 at ¶¶ 6-8. These are serious concerns, and the Pappalardos do not suggest otherwise. *See* D.E. 99. Indeed, these concerns heavily outweigh the Pappalardos' sole reason for seeking Agent Roberts's deposition — that his Declaration was submitted in support of the FTC's *Ex Parte* Motion for Temporary Restraining Order.

**2. Did a Waiver Occur?**

Although Agent Roberts's testimony is protected by the law-enforcement privilege, like any other privilege, the law-enforcement privilege may be waived. *See Dellwood Farms*, 128 F.3d at 1126. The Pappalardos argue that the FBI waived any protection afforded by the law-enforcement privilege to Agent Roberts's testimony when the FTC filed Agent Roberts's Declaration in support

---

reasonably likely to follow from the incident in question; (6) whether the police investigation has been completed; (7) whether any interdepartmental disciplinary proceedings have arisen or may arise from the investigation; (8) whether the plaintiff's suit is non-frivolous and brought in good faith; (9) whether the information sought is available through other discovery or from other sources; (10 the importance of the information sought to the plaintiff's case." *See In re Dep't of Homeland Sec.*, 459 F.3d at 570-71 (citing *Tuite v. Henry*, 98 F.3d 1411, 1417 (D.C. Cir. 1996) (citing *Frankenhauser*)). The last three *Frankenhauser* factors comprise the Second Circuit's presumption-rebuttal test. And the remaining considerations are a part of the balancing process engaged in after the presumption is rebutted. Consequently, regardless of whether the Court applies the *New York* test or the *Frankenhauser* test, the result remains the same: Agent Roberts's deposition testimony is subject to the law-enforcement privilege.

of its *Ex Parte* Motion for Temporary Restraining Order. Thus, this case does not involve an express waiver, but rather, the Pappalardos contend, a forfeiture, or an implied waiver. Because little has been written regarding implied waiver of the law-enforcement privilege, the Court considers the doctrine as it has developed in the context of other privileges.

As the Second Circuit has recognized, "Underlying any determination that a privilege should be forfeited is the notion of unfairness. This notion implicates only 'the type of unfairness to the adversary that results in litigation circumstances when a party uses an assertion of fact to influence the decisionmaker while denying its adversary access to privileged material potentially capable of rebutting the assertion.'" *In re the Cnty. of Erie*, 546 F.3d 222, 229 (2d Cir. 2008) ("*Erie*") (quoting *John Doe Co. v. United States*, 350 F.3d 299, 306 (2d Cir. 2003)). In other words, it is simply not fair to allow a party to wield a privilege as a sword to cut out the heart of an opposing party's case while simultaneously brandishing it as a shield from disclosure of any Achilles heels. *See Kallas v. Carnival Corp.*, 2008 WL 2222152, *5 n.1 (S.D. Fla. May 27, 2008) (citing *Pitney Bowes, Inc. v. Mestre*, 86 F.R.D. 444 (S.D. Fla. 1980)); *cf. GAB Business Servs., Inc. v. Syndicate 627,* 809 F.2d 755, 762 (11th Cir. 1987) (discussing the concept in the context of Florida law). Key to determining that a forfeiture has occurred, therefore, is reliance on the information sought, to the detriment of the moving party by the party invoking the privilege. *See Erie*, 546 F.3d at 229.

Here, the FTC plainly relied upon Agent Roberts's Declaration in seeking its *Ex Parte* Temporary Restraining Order. Were we still at the temporary-restraining-order stage of the proceedings, a forfeiture could well have been found with respect to Agent Roberts's Declaration.

But, since that time, the temporary restraining order has expired, and the Pappalardos have voluntarily stipulated to the entry of a preliminary injunction against them, without the FTC's

reliance on Agent Roberts's Declaration. Moreover, the FTC has expressly stated that it will not rely upon Agent Roberts's testimony any further in this case. Thus, beyond the motion in support of the already-expired temporary restraining order, the FTC has not relied and will not in the future rely at all upon Agent Roberts's Declaration. Under these circumstances, the Court cannot find the type of reliance necessary to effect a forfeiture of the law-enforcement privilege.[8] Should the FTC change its mind and attempt to present Agent Roberts's testimony for any reason in the remainder of this case, however, this Court would reach a different conclusion regarding reliance and, consequently, forfeiture.[9] Because the law-enforcement privilege requires the quashing of the Pappalardos' subpoena for Agent Roberts's deposition testimony, the Court need not address the FBI's alternative arguments invoking grand-jury secrecy and the Privacy Act.

### *III.  Conclusion*

For the foregoing reasons, the Non-parties Federal Bureau of Investigation and FBI Special Agent David M. Roberts's Motion to Quash Subpoena and for Protective Order [D.E. 98] is hereby **GRANTED**.

**DONE and ORDERED** this 7th day of December 2011.

*/s/ Robin S. Rosenbaum*
ROBIN S. ROSENBAUM
UNITED STATES MAGISTRATE JUDGE

---

[8] Even if a forfeiture of the law-enforcement privilege had occurred, it would be limited to the contents of the Declaration. *See Puerto Rico*, 490 F.3d at 66 (concluding that the release of a document protected by the law-enforcement privilege "only waives [the] privilege[] for the document or information specifically released, and not for related materials") (citing *In re Sealed Case*, 121 F.3d at 741; *Smith v. Cromer*, 159 F.3d 875, 880 (4th Cir. 1998)).

[9] The Court might also consider any other appropriate remedies.

cc: Hon. William J. Zloch
    Counsel of Record